**Jeffrey Todd GREAVES, Plaintiff and Appellant,**

v.

**NORTH DAKOTA STATE HIGHWAY COMMISSIONER, Defendant and Appellee.**

Civ. No. 880151.

Supreme Court of North Dakota.

Dec. 6, 1988.

Robert W. Kinsey, Crosby, for plaintiff and appellant.

Myron E. Bothun, Asst. Atty. Gen., Bismarck, for defendant and appellee.

VANDE WALLE, Justice.

This is an appeal from the judgment affirming the State Highway Commissioner's decision to revoke the driver's license of Jeffrey Greaves for violation of Section 39-08-01 of the North Dakota Century Code. Because we conclude that the blood test was inadmissible, we reverse.

On September 27, 1987, Greaves was stopped by Gregory Sinclair of the North Dakota Highway Patrol. Greaves was placed under arrest and taken to the Divide County sheriff's office. While at the sheriff's office, Greaves submitted to two Intoxilyzer tests and one blood-alcohol-content test. The first Intoxilyzer test was administered at 1:02 a.m. and indicated a blood-alcohol content of .091 percent. At 1:09 a.m. Kent Nygaard, a Crosby police officer and emergency medical technician-intermediate (E.M.T.-I.), withdrew a sample of Greaves's blood in order to test for blood-alcohol content. The results of the blood test, which was analyzed by the State Toxicologist's office, indicated that Greaves had a blood-alcohol content of .10 percent. At 1:10 a.m. a second Intoxilyzer test was administered to Greaves and indicated a blood-alcohol content of .095 percent.

At the administrative hearing to revoke Greaves's license, Greaves argued that Nygaard was not qualified under Section 39-20-02, N.D.C.C.,[1] to obtain a blood sample. The Commissioner's decision concluded that Nygaard was a "qualified technician" under the statute and, because of the results of the blood test, revoked Greaves's license for 91 days. Greaves appealed the decision of the Commissioner to the district court and the district court affirmed. On appeal to this court, Greaves argues that Nygaard was not qualified to withdraw blood for blood-alcohol purposes and there-

---

1. Section 39-20-02, N.D.C.C., provides in part that "[o]nly a physician, or a qualified technician, chemist, or registered nurse acting at the request of a law enforcement officer may with-draw blood for the purpose of determining the alcoholic, drug, or combination thereof, content therein."

fore the results of that test should have been suppressed.[2]

An appeal from a district court judgment involving a license suspension under Section 39–20–05, N.D.C.C., is governed by the Administrative Agencies Practice Act, Chapter 28–32, N.D.C.C. See *Moser v. North Dakota State Highway Com'r*, 369 N.W.2d 650 (N.D.1985). Pursuant to that chapter, we examine the record of the administrative agency rather than the findings of the district court. Our review of an administrative hearing is limited to the following:

(1) Is the decision of the agency in accordance with the law? (2) Is the decision of the agency in violation of the appellant's constitutional rights? (3) Have the provisions of Chapter 28–32 been complied with? (4) Was the appellant given a fair hearing? (5) Are the findings of fact supported by a preponderance of the evidence? (6) Are the conclusions of law sustained by the findings of fact? (7) Is the agency decision supported by the conclusions of law? See Sec. 28–32–19, N.D.C.C. See also *Dodds v. North Dakota State Highway Com'r*, 354 N.W.2d 165 (N.D.1984).

Greaves argues that Nygaard is not a "qualified technician" as required under Section 39–20–02, N.D.C.C., because The Emergency Medical Technician—Intermediate: National Standard Curriculum [Curriculum][3] does not address the training of E.M.T.–I.s for the withdrawal of blood. Furthermore, he asserts, even if an E.M.T.–I. may be qualified to withdraw blood, there is no factual basis in the record to indicate that Nygaard was qualified.[4]

There are obvious reasons for requiring certain qualifications of those authorized to withdraw blood. The health of the individual is paramount. Protection against infection and pain can best be afforded by allowing only a qualified person to administer a blood test. The accuracy of the test also depends in large part upon the ability of the person drawing the blood to be able to obtain a fair sample.

Our Legislature has not defined the term "qualified technician." Other courts have considered whether a person who administered a blood test was qualified to do so. See, e.g., *State v. Counts*, 457 So.2d 568 (Fla.Dist.Ct.App.1984) [term "physician" encompasses first year resident physician]; *State v. Winquist*, 247 N.W.2d 256, 259 (Iowa 1976) ["The question is one of training in withdrawal of blood. The test to determine whether a person holding himself out as a medical technologist is a medical technologist within the meaning of [the statute] is whether a satisfactory showing can be made that he has sufficient training in the withdrawal of blood to accomplish the legislative objectives of protecting the individual's health, guarding against infection and pain, and assuring the accuracy of the test, all in accordance with accepted medical standards. The concern is with the competence of the person withdrawing the blood rather than with an occupational label he may have been awarded by a private association."]; *State v. Carter*, 446 P.2d 759, 202 Kan. 63 (1968) [resident doctor

---

**2.** Greaves also argues that requiring the blood test was unreasonable because the officer already had a scientifically accurate test—the first Intoxilyzer test. He also argues that the findings of fact made by the Commissioner were not supported by a preponderance of the evidence because the two Intoxilyzer tests showed a blood-alcohol content of less than .10 percent and the single blood test showed exactly .10 percent; that is, the two Intoxilyzer tests establish by the greater weight of the evidence that Greaves's blood-alcohol content was below .10 percent. Because the issue stated in the text is determinative of the case, we do not consider the other issues raised by Greaves.

**3.** The Curriculum is used to help train people to become E.M.T.–I.s.

**4.** The record indicates that Nygaard has withdrawn blood for blood-alcohol analysis a total of seven times and has withdrawn blood a total of 20 to 30 times. There is also evidence that Nygaard was trained in initiating intravenous therapy (IV) and that anyone who is able to initiate IV therapy also possesses the ability to draw blood. Nygaard testified that he had initiated in excess of 100 IVs.

who was a foreign medical school graduate was a "qualified technician"]; *State v. Taylor*, 483 So.2d 250 (La.Ct.App.1986) [police officer who had emergency medical training through police department which included drawing of blood, had attended five weeks of classes in phlebotomy at a local technical institute and was a certified phlebotomist was a "qualified technician"]; *State v. Welch*, 468 So.2d 599 (La.Ct.App. 1985) [the court found that a cardiopulmonary profusionist who had specialized training, was supervised by a pathologist, had taken 60,000 blood drawings, and had testified 40–50 times in court was a "qualified technician" under the law]; *State v. Webster*, —— Nev. ——, ——, 726 P.2d 831, 833 (1986) ["We are particularly concerned with the burdens which would be imposed on small, rural health care facilities if 'technician' is construed [too narrowly."] What the spirit of the law requires is that a "medically trained and competent individual withdraw the blood sample in an acceptable manner." Thus the court remanded in order to have the trial court determine if the laboratory assistant was competent to withdraw blood.] *McGuire v. State*, 504 P.2d 1247 (Okla.1972) [nurse had 28 months of training which included the taking of blood samples; court said person with this training and experience would fall under the term "qualified technician" and the court noted that she took the sample at the direction of a doctor].

 Our Legislature has, however, prescribed the circumstances in which an E.M.T.–I. is authorized to function. Section 43–17–02(10), N.D.C.C., provides:

"The provisions of this chapter [regulating physicians and surgeons] shall not apply to the following:

"10. Any person rendering services as a physician's trained assistant, if such service is rendered under the supervision, control, and responsibility of a licensed physician and provided that *the state board of medical examiners shall prescribe rules and regulations governing the conduct, activities, and supervision of physicians' trained assistants.* Physicians' trained assistants shall not be authorized to perform any services which must be performed by persons licensed pursuant to chapters 43–12, 43–13, 43–15, and 43–28 or services otherwise regulated by licensing laws, notwithstanding the fact that medical doctors need not be licensed specifically to perform the services contemplated under such chapters or licensing laws." [Emphasis added.]

Pursuant to this section the Board of Medical Examiners has adopted the following administrative regulations found in the North Dakota Administrative Code. Section 50–03–03–05 provides in part:

"Every emergency medical technician certified to perform emergency medical services must be under the direction and responsibility of at least one physician licensed to practice medicine in this state."

Section 50–03–03–03 provides:

"Any person possessing emergency medical services skills over and above those found in the emergency medical technician basic national standard training curriculum may perform those skills only if under the direction of a physician who has assumed responsibility for the services of that person through a written statement on file with the office of the board of medical examiners. That person must have met the training requirements of the North Dakota state department of health for such skills."

Nygaard had written authority from Dr. M.S. Nandra to "provide prehospital emergency medical care consistent with the skills possessed by an EMT–I." The E.M.T.–I. Curriculum describes the occupation of E.M.T.–I. as one who "primarily provides prehospital emergency care to acutely ill or injured patients by ambulance service and mobile advanced life support units under medical command authority, and secondarily, in other appropriate settings under physician control." The Curriculum further states that "other appropriate settings" means "a facility, such as a clinic, an emergency department, or the private practice of an individual duly licensed to practice medicine in all its branches."

In the present case there was no medical emergency and the blood sample was taken

from Greaves while he was in the Divide County sheriff's office. The Curriculum was not designed or intended to train someone to act as Nygaard did.

Nygaard testified that he had standing orders which permitted him to draw blood. But he also testified that those orders did not specifically give him the authority to withdraw blood for purposes of determining blood-alcohol content. In view of the record the authority given Nygaard to draw blood must be considered together with the letter from Dr. Nandra granting Nygaard the authority to administer prehospital emergency care. Considering Nygaard's testimony and the letter from Dr. Nandra giving Nygaard the authority to administer prehospital emergency care, we conclude Nygaard has the authority to perform a blood test in the event the need arises while he is administering prehospital emergency medical care.

It is not the function of this court to expand the authority of an E.M.T.–I. beyond that prescribed by the statutes and regulations. That is a policy matter best left to the legislative and executive branches of government. We cannot discern that the use of the term "qualified technician" in Section 39–20–02 was intended to expand the authority of an E.M.T.–I. beyond that specified in the statutes and regulations.

Because Nygaard had authorization to perform only prehospital emergency medical care and Greaves concededly did not fit within that category, Nygaard was not authorized to withdraw blood from Greaves. Therefore, the results of the blood test are inadmissible.

For the reasons stated above, the Commissioner's decision was not in accordance with the law. Thus the decision of the district court affirming the Commissioner's decision is reversed.

ERICKSTAD, C.J., and GIERKE, MESCHKE and LEVINE, JJ., concur.